1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

JOHN CHARLES DOMINGUEZ,                    1:11-CV-01491 GSA HC

           Petitioner,            ORDER DENYING PETITION FOR WRIT OF
                                           HABEAS CORPUS

    v.
                                           ORDER DIRECTING CLERK OF COURT TO
                                           ENTER JUDGMENT AND CLOSE CASE
R. H. TRIMBLE, Warden,
                                           ORDER DECLINING ISSUANCE OF
           Respondent.            CERTIFICATE OF APPEALABILITY
_____/

     Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254. The parties have voluntarily consented to the jurisdiction of the

magistrate judge pursuant to 28 U.S.C. § 636(c).

**BACKGROUND**

     Petitioner is currently in the custody of the California Department of Corrections pursuant

to a judgment of the Superior Court of California, County of Stanislaus, following his conviction

by jury trial on April 9, 2008, of murder in the second degree (Cal. Penal Code § 187).

(See Petition at 2.) The jury also determined that Petitioner had personally used a deadly weapon

during commission of the offense. (See Answer, Ex. 1.) Petitioner was sentenced to serve an

indeterminate term of 16 years to life in state prison. (Id.)

     Petitioner filed a timely notice of appeal. On August 24, 2010, the California Court of

Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

decision. (See Answer, Ex. 1.) Petitioner filed a petition for rehearing, but rehearing was denied

on September 17, 2010. (See Answer, Ex. 2.) Petitioner then filed a petition for review in the

1  California Supreme Court.  (See Answer, Ex. 3.)  The petition was summarily denied on

2  December 15, 2010.  (See Answer, Ex. 3.)

3        On July 8, 2011, Petitioner filed the instant federal habeas petition.  He presents the

4  following claims for relief: 1) He claims the trial court abused its discretion by excluding gang

5  membership evidence in violation of his constitutional rights; 2) He contends the trial court's

6  denial of his motion for new trial violated his right to effective, conflict-free assistance; 3) He

7  claims his trial counsel rendered ineffective assistance by failing to object to prosecutorial

8  misconduct during summation; and 4) He asserts the appellate court misstated or omitted

9  material facts and legal issues in its opinion denying Petitioner's direct appeal.  On February 17,

10  2012, Respondent filed an answer to the petition.  Petitioner did not file a traverse.

11                              **STATEMENT OF FACTS**[1]

12  *Prosecution Evidence*

13        As of February 16, 2006, Dolores Garza resided in the 1800 block of Donald
   Street, Modesto, with appellant, her boyfriend. The couple lived in a converted garage
14  behind the house. Tony Trevino, who owned the property, lived in the main house, along
   with Antonia Ramirez (Garza's sister), Veronica Ramirez (Garza's niece), Diana Ramirez
15  (Garza's other niece), and Veronica's and Diana's children. Sonya Bullard and Jennifer
   Westman lived in the back room of the main house.[FN2] That room could only be accessed
16  from the outside.

17        FN2. For the sake of clarity, we refer to some of the Donald Street residents by
          their first names. No disrespect is intended.
18
   On the night of February 16, 2006, Christopher Herd, the father of Diana
19  Ramirez's baby, was at a residence on Marselle, about three blocks from the Donald
   Street house. He was talking to Nick Bargas, who lived there, when he came in contact
20  with Bargas's cousin, Richard Chavez. With Chavez was Nehemiah Rodriguez. Chavez
   and Rodriguez were looking to trade property, including a bicycle, for methamphetamine.
21  Bargas said he did not have any. Also joining in the conversation was Robert Sanchez,
   the father of Veronica Ramirez's baby, who was driving a white Ford Explorer.
22
        After about 10 minutes, Rodriguez and Chavez left and eventually headed to the
23  residence on Donald Street. They went there to get high, and to get a ride from Sonya,
   whom Chavez knew. Witnesses' accounts differed with respect to what happened after
24  Chavez and Rodriguez arrived at the Donald Street house.

25        According to Garza, someone knocked on the door between 11:00 p.m. and
   midnight. When she answered, two men she had never seen before asked if Tony or
26

27        [1]The Fifth DCA's summary of the facts in its August 24, 2010, opinion is presumed correct. 28 U.S.C.
28  §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court
   adopts the factual recitations set forth by the Fifth DCA.

                                        2

Sonya was home.[FN3] One was wearing a red shirt and red cap. Garza responded that Tony was in his room, but Sonya was at work. The men asked if they could go in Tony's room. Garza invited them in and walked them to Tony's room. As she was doing so, one of the men said something disrespectful. The other said to ignore him, that he had been drinking. Garza did not get upset, but took them to Tony's room, told Tony they were there, and then returned to the kitchen. The men shut the door to Tony's room.

FN3. Although Garza did not identify either man, there was no dispute that they were Chavez and Rodriguez.

Chavez and Rodriguez remained in Tony's room for 15 to 20 minutes, then Garza's niece said they were selling some jewelry or something. Garza responded that she was not interested, then called appellant from the back kitchen door and told him the food she had been making was ready. As appellant came in, Chavez and Rodriguez were walking from the back room into the kitchen. They asked if appellant was interested in buying some tools that one of them had in a backpack, but he told them no.

Appellant walked out, and Garza waited for Chavez and Rodriguez to walk out behind him. She and appellant were going to their room. Rodriguez and Chavez went to Sonya's door. From inside their room, appellant and Garza could hear them loudly knocking and calling her name. Appellant and Garza both went out, and appellant told them that Sonya was not home, but they could come back tomorrow if they wanted to talk to her. He told them not to be loud, because the children were asleep in the house. Appellant then went back into his room, but Chavez and Rodriguez continued loudly to knock and call to Sonya. Appellant told them to leave and come back the next day, and they could talk to her then. He told them to leave the property and not be disrespectful.

The men started to walk away, but, as they passed in front of appellant, one of them started getting mad and cussing. Appellant told him to leave the property, that he did not want any problems, and just to come back tomorrow.

Chavez and Rodriguez crossed the street and started yelling things. One of them said something like, "'Well, get the gun out, get the gun out.'" Garza did not see anyone get a gun, nor did she adjust her positioning or go inside the house after the statement was made. She was yelling at them to leave, because there were babies in the house. Appellant was telling them that he did not want any problems with them, and just to leave. Chavez and Rodriguez began throwing sticks and rocks toward appellant and Garza. Appellant picked up a rock and threw it back. Garza told him to let them go. The objects were not hitting anyone. At some point during this time, Chavez and Rodriguez said they were going to come back with their uncles and the Mexican Mafia, and they were going to get some guns and come back and shoot at the house. They said this twice, to Garza's recollection. She was scared.

After this had gone on for three to five minutes, Herd and Sanchez arrived in Sanchez's white Ford Explorer SUV. After Garza explained what was going on, Sanchez opened the back of his truck, and Herd got something that looked like a stick or a baseball bat. He and Sanchez stood next to appellant. Chavez and Rodriguez were yelling and making threats, and words were exchanged between the two groups. Chavez and Rodriguez then took off running. All Garza could see in their hands were the tools they had been trying to sell, but after the incident, a crossbow was missing from the kitchen counter near the back door.

Herd, Sanchez, and appellant, who had nothing in their hands, ran after Chavez and Rodriguez. The three then came back and got in Sanchez's truck. Sanchez was driving. Garza then lost sight of them. She did not see Rodriguez or Chavez again that

night. Herd, Sanchez, and appellant all returned in the truck, however. Appellant went to his room, Herd stayed in the driveway and used his cell phone to call for a ride, and Sanchez went in the house for a couple minutes to talk to Veronica and then left. No more than about eight minutes elapsed from the time Garza lost sight of them to their return.

Appellant had a cut on his shoulder and on his head, and Garza asked if they had gotten into a fight with the other two men. Appellant said he hit one of the men on his back. He mentioned self-defense. He finished eating, then he and Garza went to bed. They were awakened the next morning by a police officer kicking the door open. After they had been handcuffed and were being walked to the front, appellant told Garza to say his name was Sam.

According to Rodriguez's version of events, he and Chavez knocked on the door, went inside, and were approached by some women. Chavez asked if Sonya was there. When they said no, he asked for someone named Mike. The women said he was in the room, and to go talk to him .[FN4] When the two men entered the house, there was a baby on the couch. Chavez said to the mother, "'It's a cute baby. She don't get her looks from you, though.'" The lady got mad, but then calmed down when Rodriguez said it was just a joke.

FN4. According to Diana Ramirez, the only "Mike" living at the house was her five-month-old son.

Rodriguez and Chavez went into Mike's bedroom, and the three of them smoked some methamphetamine. After about 15 minutes, Chavez and Rodriguez left the room. They might have tried to sell some costume jewelry and some tools. Someone said Sonya might be out back, so they went through the house and out the door that led to the back, where there were small living quarters.

Chavez had barely knocked on the door when appellant came out of another structure and said Sonya was not there. When Chavez knocked again, appellant started getting loud, cursing and saying she was not home and to get the hell out of there. Chavez and Rodriguez cursed back. At first, Chavez said appellant was not going to tell him to get out of there, but then they said fine, that they were going to leave. They started walking away, but appellant kept following them and telling them to get the hell out. He acted like he wanted to fight.

Chavez and Rodriguez went out in the middle of the road. Someone said one-on-one, and Rodriguez agreed. Appellant picked up a pretty large stick. Chavez and Rodriguez told him to drop the stick and go one-on-one if he wanted to fight, but if not, to leave them alone, as they were leaving. Chavez never said he was going to go get the Mexican Mafia or a gun and come back.

By this time, appellant was standing in the way of Chavez and Rodriguez getting to their bicycle, which was parked in front of the house. They again told him to put down the stick, but he threw it at them instead, and they threw it back. Rocks may also have been thrown back and forth. There were several people standing in the road in front of the residence. Appellant was waiving a stick in the air and screaming obscenities at Chavez and Rodriguez, and they were screaming obscenities back.

While this was going on, a white Ford Explorer pulled up. Two people jumped out and went to the crowd; now there was a large group of people, and it looked like they were going to gang up on Chavez and Rodriguez. Rodriguez felt threatened. Appellant and the two men who had gotten out of the truck started running at them, and Chavez and Rodriguez fled, leaving their bicycle, because they were being chased with what looked

like bars and the same stick.

Chavez and Rodriguez ran around the corner, went two blocks up, turned another corner, and tried to get into a house on Robertson Road. Fearing for their lives, they both banged on the door and begged to be let in. After a minute or two, they went back out toward the road, but then saw the Ford Explorer coming down the street, pursuing them. They headed back toward the house. There was a small chain-link fence; Rodriguez threw down the pair of pliers he had in his hand, yelled at Chavez to come on, jumped the fence, and ran to the back of the yard. Chavez was not with him.

Rodriguez remained in the back for a few seconds, then ran toward the front of the house. When he did not see anyone, he ran across the street to a school and hid by one of the classrooms for about an hour. Eventually, he made his way back to Chavez's residence and fell asleep by the door. He was awakened by two detectives.[FN5]

FN5. Benny Melchor, who lived in the house on Robertson, heard a commotion and could tell someone was outside the front of his house. He then heard pounding and someone saying, "'No mas, no mas,'" meaning, "no more, no more." The commotion subsided within seconds. When Melchor looked out the window, he saw a white SUV in the middle of Robertson. A person to the right of it appeared to be carrying a long object like a pipe or a bat. He was walking toward Pine Tree Lane. Melchor called 911. When he peeked out the window again, the vehicle was gone. He then saw someone come out from the garage area and walk toward the front of the house, using the driveway. The person appeared to be a Hispanic male. He walked out to the street. Melchor subsequently noticed that part of his fence was down in the area from which he had seen the person emerge. There was also an indentation in the wall by the front door and some damage to the porch railing. A broken crossbow was found near a trash can that had been knocked down, and a dark-colored baseball cap was found on the porch or in the grass. Blue-handled pliers were found in the front yard.

Herd testified that he and Sanchez talked for a while at the Marselle residence, then decided to go to a park near the Donald Street residence to smoke some marijuana before going to the house to visit their children. On their way to the park, they drove past the Donald Street residence. Herd saw a commotion in the middle of the street. Several women and three men were chasing each other back and forth.

Sanchez pulled into the driveway, then he and Herd went to see what was going on. Appellant, who lived at the house, was there. Chavez and Rodriguez were throwing rocks and other objects at him. Herd heard Chavez and Rodriguez saying to appellant that they were going to fuck him up. Appellant was yelling back. Herd did not see any sort of weapons, although he saw Chavez, Rodriguez, and appellant throwing sticks and rocks back and forth while they were about 15 to 20 feet apart. Herd did not believe anyone was hit.

Shortly after Herd and Sanchez pulled up, Chavez and Rodriguez took off running. Herd told appellant to let it go, but appellant ran after them. Sanchez got into the truck and said that he was not going to let Chavez and Rodriguez jump appellant. Concerned for Sanchez's safety, Herd got in the vehicle with him, and Sanchez drove after the trio.

Spotting the others in the front yard of a home in the 1900 block of Robertson Road, Sanchez pulled into the driveway. Herd saw Rodriguez jump the fence, and that was the last Herd saw of him. Chavez was on the porch of the house. Appellant was outside the porch enclosure. Each was saying he was going to fuck the other up.

Appellant was trying to grab Chavez, who was backing up on the porch. They were swinging what appeared to be sticks at each other. Chavez took some fake swings at appellant, then struck appellant once in the head with a crossbow, and appellant went down. Chavez then jumped over him and took off toward Pine Tree Lane. Appellant, who Herd believed had a stick in his hands, ran after Chavez. Herd lost sight of them. Everything happened quickly; it was more or less the same commotion as at the Donald Street residence, but it had moved to another location.

Sanchez had just backed out of the driveway when appellant hopped in the back seat of the vehicle. This was about two or three minutes after Herd had lost sight of him. Appellant had no sticks or weapons with him. Herd asked him what happened, but appellant did not reply. The group returned to the Donald Street residence, where Sanchez dropped his passengers off and left. Herd again asked appellant what happened. Appellant said he had hit him in the back. When Herd asked if appellant thought he was okay, appellant replied that he thought he might have killed him. Herd then left on foot.[FN6]

FN6. Late on February 16, Carlos Mejia, who lived in the 1200 block of Pine Tree Lane, heard two voices arguing outside. He looked out the window and saw somebody hitting someone with a pipe or bat. The person who was swinging the object was standing. The other person appeared to be on his knees in front of a window at a house on the other side of the street, covering his head with his hands. The first person swung the object one time, then threw it over his shoulder and walked away. Mejia heard him say, "'That's what you get for messing with me.'" The person walked toward Robertson Road. Mejia's wife called the police.

Sometime after 11:00 p.m. on February 16, 2006, Modesto Police Officer Niles was dispatched to the 1200 block of Pine Tree Lane in response to a disturbance call. The front window of one of the houses had been broken from the outside in. On the ground beneath the window, Richard Chavez, who was wearing a red shirt and black-and-red gloves, was on his knees in a fetal position, his hands on the ground and his head on his hands. There was a large wound on the top of Chavez's head, and he was not breathing and had no pulse. He had nothing in his hands, and there were no tools or weapons of any kind within a foot of his body. There was, however, a two- to three-foot-long, heavy metal pipe in the grass. Nonblood, cellular material from Chavez was found near one end of the pipe. An area at the other end that tested presumptively positive for blood yielded a partial DNA profile that was consistent with that of appellant.

An autopsy revealed that Chavez sustained a severe laceration on the top of his head, a fractured skull with severe subarachnoid hemorrhage over the brain, a shattered orbital plate, and two minor abrasions to the top of his left shoulder. Death was caused by blunt trauma to the head, consistent with a massive impact from something like a large, heavy pipe such as the one found in the grass at the scene. There were between one and three blows, one of which was fatal. Chavez was most likely immediately knocked unconscious by that blow. Chavez had a blood-alcohol level of .20, and was also under the influence of methamphetamine. The two would tend to cancel each other out, as alcohol is a depressant and methamphetamine is a stimulant.

Modesto Police Sergeant Coyle interviewed Garza at the Donald Street residence on the morning of February 17, and then later that day at the police station. At no time did she say anything about someone threatening to bring the Mafia or gangs over. Garza related that appellant, Sanchez, and Herd had gotten together and talked about what their defense would be.

Modesto Police Detectives Grogan and Owen interviewed appellant on the evening of February 17, after advising him of his rights.[FN7] According to appellant, he

went into the house, and there were two men there, trying to sell something. It "kinda pissed [him] off" that his girlfriend was in there with them, but then they asked if Sonya was home. Appellant told them no, but about five minutes later, they were out back, knocking on Sonya's door and calling for her. When appellant asked what they were doing, one of the two accused him of getting smart with them. Appellant said this was not their home, and that they were not going to tell him how to act at his house. They were walking away, but they kept talking about a gun or something and "shoot the mother fucker or whatever," and appellant told them they were being stupid and were not to talk like that around the kids and the women.

FN7. A video recording of the interview was played for the jury.

The argument escalated out to the road, and one of them kept saying something about "get the gun, get the gun ah shot his ass" or something. This got appellant "pretty pissed off," because there were people outside and girls everywhere, and he did not know whether the men had a gun. He was telling the girls to get in the house, and the men were yelling at him and they were throwing rocks back and forth at each other. Appellant suggested they box one-on-one, but they would not go for it. At this point, Sanchez pulled up and asked what was going on. Appellant told him the two were "startin' shit for no reason," and the two then took off running. Sanchez suggested they go get them, so they chased the pair, then went back and got Sanchez's truck. Once in the truck, they went to find them. One of them was standing on the front porch of a house on Robertson. Appellant was the first one out of the truck, and he started running after the one on the front porch. Appellant was going to hit him, but appellant slipped and the man hit appellant in the back of the head twice with a crossbow or something. The other man took off into the backyard and disappeared. The first one took off down the road. Sanchez then said they should get out of there, because it was someone else's house. They got back in Sanchez's truck, and then Sanchez dropped appellant off and appellant went to bed.

Appellant subsequently related that he threw the first stick, which was actually a hatchet handle. He was the only man there, and he wanted the others to leave. When they would not, he threw it across the street and hit one of them in the side. The person he hit picked it up and started hitting the ground with it, inviting appellant to come on and calling him names. That was when appellant grabbed a pipe and told the men to come and do whatever they wanted to do. They started toward him and he got worried, so he threw the pipe at them, too. He did not hit anyone, but they picked up the pipe, and that was when Sanchez arrived and they took off running. Appellant asked the detectives what happened, and Grogan informed him that one of the men got hit and ended up dying from it. Appellant expressed surprise.

The detectives took photographs of the injury to appellant's head, as well as a bruise and abrasion on his shoulder.[FN8] There were also cuts on his hands, which appellant explained had resulted from when he was cutting some wire earlier. Appellant related that he recalled chasing the person after being hit in the head. He chased him down a street, then the man tried to jump through a window, but the window did not break. The man went down on the ground and covered his head. That was when Sanchez picked appellant up and told him to get in the car, because the cops were going to be called. Appellant denied hitting the victim with the pipe. He said he did not go up to the victim when he tried to jump through the window because he thought the victim was playing possum and had something in his hand with which to hit appellant.

FN8. On the top of appellant's head, toward the back, was a bruise about the size of a quarter.

When informed that some people were telling the police that appellant had said he hit the victim, appellant said that when the victim was on the porch on Robertson Road,

appellant had gotten out of the truck, picked up the pipe from off the ground, run to the front porch, and tried to hit him, but was unsuccessful and might have hit the wall. Appellant thought he threw the pipe at the victim and missed. He tried to retrieve it so the victim could not get it, but the victim hit appellant in the back of the head, then jumped off the porch and took off down Pine Tree. Appellant said he did not have the pipe after that. He denied striking the victim with the pipe on Pine Tree Lane, although he admitted he might have gotten home and bragged about hitting him twice. When Grogan said he had no doubt appellant hit the man, but was trying to understand appellant's intent, appellant replied, "My intent was to kick his ass I mean to be honest with ya. But I never, I never hit him in the head with no pipe or nothin' that I know of and I mean I intentionally." Appellant said he was not the type of person to kill somebody. He just got mad.

After a break during which the detectives said they were going to talk to some other people, Grogan told appellant that one of the men who was with appellant said that things got out of hand and appellant was the one who hit the victim. Appellant related that the victim "straight up pissed [appellant] off" by hitting him in the head. Appellant chased him down the road. He could not remember if the victim threw the pipe at him or how it happened, but appellant ended up with it. The victim hit the window and fell down. Appellant saw Sanchez coming and threw the pipe. He did not know where it hit the victim, although he was hoping it hit him, because appellant was angry. Appellant then jumped in Sanchez's truck and they went home.

Grogan informed appellant that a witness who did not know appellant said that appellant was standing up and swinging the pipe, not throwing it from a distance. Appellant insisted that he was not trying to hurt or kill anyone. Appellant explained that the victim said he was going to come back with the Mafia and kill everybody, and appellant just wanted to catch him so that would not happen. He said that no one at the house deserved this, and that all he wanted to do was make sure the man was not going to come back, not by killing him, but just talking to him and telling him not to be threatening people who had been family for appellant.

Grogan asked where, when appellant swung the pipe, he was trying to hit the victim. Appellant responded that he did not know where he was going to hit him, and that he was just angry. He insisted he would never try to hit somebody in the head with a pipe. Appellant was chasing the victim with the pipe, and the victim was running, and then ran into the window and went to the ground. Appellant did not know what the victim was going to do, so he hit him twice with the pipe. Then, as appellant was walking away, he threw the pipe in the victim's direction, He did not know if it hit him or not, but appellant remembered saying something like, "man, you fuckin' shouldn't started shit with fuckin' people." Appellant did not remember what he said, but he was mad. He did not think the person was dead.

Appellant explained that his intent, in going after the two men, was just to try to prevent the victim from coming back and doing what he said he was going to do. One of the two said he was going to get somebody named Nick and that they would be back and appellant could rely on it. Appellant did not know how he was going to prevent them from coming back; he was actually prepared to let everything ride until someone showed up in a vehicle and said, "hey, let's go fuck 'em up," and like a dummy, he went with it.

Grogan asked appellant to lay out how everything happened. Appellant replied that it was late, and the two asked appellant if his cousin Sonya was there. He told them no, but they went and knocked on her door anyway. Sonya had a lot of things in the backyard, and people would come over and act like they were knocking on her door when they were really just looking around to see what they might take. Appellant told the two

8

men that Sonya was not there and that he had told them that, and he asked why they were back there. One of them asked if he had a problem. Appellant said no, but the one acted as if he was going to hit appellant. Appellant said he did not want any problems, and then they talked all the way out to the road. At that point, it was just appellant by himself, and the two men. Appellant was getting sick of it, so he picked up an ax handle, threw it across the road, and told them to get out of there. The girls then came out of the house and were yelling and screaming. Appellant could not take it. The two men were across the road, hitting the ax handle on the road and saying, "I'm gonna fuck you, I'm gonna fuck you up. I'm gonna go get my cousin and the fuckin' mafia come back and you all are gonna be dead and bullshit." The two were "just talkin' a buncha shit," so appellant threw rocks at them and told them to get out of there. He was hoping to hit one so that the other would take off.

Appellant related that about this time, Sanchez pulled up. Sanchez could tell something was not right, and it angered him, because his woman and child lived there. The groups were more equally matched now, so appellant's group chased the two men around the corner, then they went back and got Sanchez's vehicle and then went to Robertson Road. Appellant was angry and either jumped out or someone let him out, and he ran to the front porch. He wanted to grab the man starting all the trouble. Appellant did not remember whether he threw something at the man or swung the pipe and missed, but appellant fell and the man started hitting him in the head with something over and over. This made appellant angry. Then the man took off running down the street. Appellant threw the pipe at him, because he was so mad, and it accidentally hit Herd. This made Herd stop chasing the man, so appellant started chasing him. Appellant did not know whether the man picked up the pipe. The man hit the window at the other house, and appellant ran up and hit him twice. Appellant was "just angry...." Appellant did not mean to kill anyone. He thought he hit the man in the shoulder and back. He did not remember how he ended up with the pipe. He thought Sanchez was following him in his vehicle at this point. Sanchez knew appellant was mad and was telling him not to do it, to just get in the car and go.

Appellant explained that he did not want the two men "thinkin' it was just gonna be fuckin' kids that are played with...." He wanted to let them know that they were going to "get their ass beat again" if they came back. He did not want them taking him lightly. Appellant expressed his regrets to the victim's family. Appellant stated: "I didn't think he was that hurt, I didn't give a fuck, I just felt retribution was done and I was just leavin' it at that, I didn't give a fuck you know, 'cause I was just pissed off at the time, that's all. I didn't fuckin want to hurt nobody though."

*Defense Evidence*

Chavez and Rodriguez, whom Diana Ramirez did not know, came to the Donald Street residence on the night of February 16, 2006. They tried to sell her some tools. Later, she heard arguing from the back of the house. She saw the two men hit appellant with an object, and they were cussing at Garza and appellant and threatening to come back and bring people and rip up the house. They would start walking off, then start cursing and yelling and saying they were going to bring people back and for all of them to watch their backs because they were going to shoot up the house. Diana thought they said they were going to bring back the Mexican Mafia. Veronica heard Garza yelling at the men about disrespecting her. Appellant was with Garza at the time. At some point, she heard the men say they were going to come back with someone name Nick and shoot up the house. They also said something about the Mafia. Veronica heard appellant ask to fight one-on-one with one of them. Antonia heard one of the men say he was going to come back with his Mafia and some more people and shoot the house. Antonia was scared, and told Veronica to get the children and put them in the back room.

9

When interviewed by police on February 17, Diana told them that she did not know anything about what happened, as she had been sick and slept all day. She lied because she was afraid. Four men had shown up who were friends of Chavez and Rodriguez. They were threatening and angry, and Diana thought they were part of their own Mafia. They asked where appellant was. The police arrived less than a minute later.[FN9] Diana admitted, however, that she also lied when questioned by Sergeant Coyle earlier that morning. At that time, she was afraid of the two men who had just left, and of the threats. When Antonia was first interviewed by Detective Delgado around 4:30 a.m. on February 17, she was very evasive. There were several other people inside the residence, and she told him she did not want to tell him what happened, because there were too many people around and she did not want to seem like a snitch. Delgado subsequently interviewed Antonia at the police station. She said nothing about anyone saying they were going to come back with the Mafia or with guns.

FN9. After talking to Rodriguez, Detective Grogan went to the apartment complex on Marselle, where he made contact with Nick Bargas and advised him of what had happened to Chavez. Grogan subsequently went to the Donald Street residence. By the time he arrived, other officers and detectives were already there. Bargas was also there, along with two other men. Grogan talked to Bargas for a couple of minutes, then told him to leave the area. Bargas, who was Chavez's cousin and also related to Sanchez, complied.

Robert Sanchez testified that on the night of February 16, he and Chris Herd made plans to meet at the apartment complex where Nick Bargas, Sanchez's uncle, resided. While there, Sanchez came in contact with Richard Chavez. Sanchez and Herd subsequently left in Sanchez's white Ford Explorer. They drove in the direction of the Donald Street residence and, as they drove by the street, Sanchez saw a commotion in front of the house. Sanchez, who was on methamphetamine and marijuana, pulled into the driveway.

When Sanchez got out of his truck, Chavez and Rodriguez, whom Sanchez did not know, were fighting with appellant. Sanchez saw a pocketknife in Rodriguez's hand, and Rodriguez cocked his hand back like he was going to throw the knife. Chavez and Rodriguez also had tools, and there was a lot of yelling back and forth. Rodriguez and Chavez were yelling that they were going to come back and get those at the house, and that they were going to get a strap, meaning a gun. Chavez was saying something about getting the Mexican Mafia. Sanchez also heard somebody say something about fighting one-on-one.

The yelling went on for four or five minutes. Sanchez, who at some point picked up a wooden stick, attempted to get involved to help appellant, because appellant was protecting the house. When Chavez and Rodriguez took off, Sanchez got his truck, then he and Herd drove toward Robertson Road. Along the way, Sanchez picked up appellant.

Sanchez stopped at a house on Robertson because he saw Chavez pounding on the door, trying to get in. He also saw Rodriguez, who disappeared into the dark between the fence and the garage.[FN10] Sanchez, Herd, and appellant all got out of the vehicle, and appellant went in Chavez's direction. As appellant approached, he threw a pipe at Chavez from about 20 or 25 feet away.[FN11] The pipe barely missed Chavez, hit the door and wall, and then landed on the floor. Appellant, who had kept running toward the porch, and Chavez then started fighting. They were "clenched together" on the porch, and Chavez hit appellant several times with a crossbow. Chavez then jumped over the porch railing and ran toward Pine Tree Lane, and appellant ran right after him. Sanchez did not recall appellant having anything in his hands, and did not see him with a pipe after he started chasing Chavez up Pine Tree Lane.

FN10. Sanchez did not see Rodriguez again that night.

FN11. This was the first time Sanchez had seen appellant with the pipe.

Sanchez and Herd got in the truck, which was in the driveway of the Robertson Road residence. They drove up Pine Tree, and Sanchez saw appellant walking toward them. Appellant got in the truck, at which time Sanchez saw Chavez kneeling down by the house. Herd said that he thought Chavez was dead. Appellant said, "'No, he's not, man, I just hit him in the back.'" They then took off. At no time during the incident did Sanchez tell appellant to stop going after Chavez and Rodriguez. Sanchez himself was still going after them, because they were threatening his family and threatening to come back.

Sanchez drove back to the Donald Street residence, dropped off Herd and appellant, and drove off. He returned to where he had seen Chavez lying. Sanchez was hoping he was all right, and was going to take him back to Bargas's residence and to explain to Bargas what had happened, but Chavez was still in the same place. Sanchez heard police sirens and saw people looking out their windows, so he drove off. He was scared. He was subsequently arrested by police, but initially did not tell them the truth because he did not want to get involved.

Appellant testified that as of February 16, 2006, he was living in a room behind the Donald Street house. That evening, he went into the main house for some reason. On his way back out, there were two men in the kitchen area whom he did not know. They asked if he wanted to buy some tools. When appellant said no, they asked if Sonya was home. Appellant said she was not. Appellant returned to his living quarters with a plate of food. He believed Garza joined him. Appellant was a little upset that Garza, his girlfriend, had been in the house with the two.

Appellant was eating when he heard someone knocking on Sonya's door. He looked out and saw the two men whispering to each other and looking around at items Sonya had outside. Appellant asked them what they were doing. One of them-appellant believed it was Rodriguez-asked if appellant had a problem. Appellant said no, but that he had already told them Sonya was not home, and he wanted to know what they were doing. Appellant was getting irritated. He did not want to fight with the two, but it was late, he was getting ready to go to bed, and he wanted them to leave.

Thinking the two men had picked something up, appellant started walking toward them to see what they were doing. They both started walking toward him, and got "right up to" his face. Appellant said that he did not mean to "get sideways" with them, but that he had already told them Sonya was not there. Rodriguez then pulled his arm back and acted like he was going to hit appellant. Appellant turned his head and Chavez said to get the gun. Appellant said he did not want any problems and was sorry if he sounded angry, and they started saying he was scared. Appellant was in fact scared; there were two of them and only one of him. He was also concerned because one was wearing red. Appellant said that if they wanted to come back tomorrow, that would be fine; Sonya would be home. They responded that they were not going to do that. They said it was not appellant's house and they did not have to do what he said. At some point while they were face to face, Garza came up and told appellant that the men needed to leave, because they were disrespecting everyone in the house.

Appellant started walking down the driveway, and Chavez and Rodriguez followed. They were whispering to one another behind him. Once out front, they were walking way, but then looked at each other, said "'Fuck this dude,'" and started coming back. Appellant picked up an ax handle that was lying on the ground and told them they

needed to get going. They started cussing. He said they then started arguing back and forth. Rodriguez said to "'stab the motherfucker,'" and Chavez kept adjusting something in his jacket and saying things like, "'I'm just going to shoot the motherfucker.'" Appellant had the ax handle in his hand, and when they started coming back toward him, he threw it at Rodriguez to keep them back. Appellant was afraid of them. Rodriguez picked it up and started hitting the road with it and saying, "'I'm going to fuck you up, I'm going to fuck you up.'" Chavez said he was going to go get the Mexican Mafia and his uncle Nick, and that he was going to come back and "fuck everybody up." Throughout the entire argument, he was talking about getting a gun.

Although afraid, appellant challenged Chavez and Rodriguez to fight one-on-one. He would rather have dealt with things then and there than to have them go get other people and guns. Appellant did not think they had a gun with them.

Appellant had a lot of pipe at his house, because he did scrap metal work there. He first handled the pipe involved in this case at the Donald Street residence, when he threw it across the street at Chavez. He believed the next time he handled it was on Robertson Road. Sanchez, appellant, and Herd were driving by and saw Chavez and Rodriguez standing off of the porch, looking at them and exchanging objects. Sanchez pulled over. Appellant got out of the SUV and started running toward them. The pipe was lying in the front yard of the house there, and appellant picked it up. Chavez went onto the front porch, and Rodriguez went toward the back. Appellant ran toward Chavez and threw the pipe at him, because, although he did not see Chavez knocking, he did not want him going into the house. Appellant believed he was at the house to get the people he had said he was going to get. This house was only about two blocks from the Donald Street residence. Appellant was about 12 feet from Chavez when he threw the pipe; it missed Chavez by two or three inches.

After throwing the pipe at Chavez, appellant ran up and grabbed him to keep him from going inside. Appellant slipped, and Chavez started hitting him in the head with a crossbow he had taken. He hit appellant twice in the head, and then, as appellant covered his head with his hands, he hit appellant in the hands. Appellant was telling him no more, he had had enough. Chavez took off, and appellant took off after him. Appellant was angry and scared. As he gave chase, he picked the pipe back up and ran with it. Chavez went into the yard at the Pine Tree residence, and went pretty much right at the window. Appellant was four or five feet from Chavez when Chavez jumped into the window with enough force to break it. Chavez went to his knees and his head was against the ground. He was in a curled-up position and his hands may have been covering his head. Appellant did not see any weapons on him. Chavez was not moving.

When Chavez went down, appellant was about two feet away from him. Appellant was holding the pipe like a person would hold a baseball bat, with both hands toward one end. He reared back with a baseball-type movement and came forward with the pipe, striking Chavez twice, hard, and killing him. Appellant then turned to leave. He tossed the pipe back at Chavez and said something like, "'This is what you get for messing with me,'" or "'You'll think twice next time you come back to my house.'" It all happened very quickly. Appellant had no opportunity to see if Chavez had weapons or was in the process of getting up. Appellant thought he hit Chavez in the back, because that was what he saw when he swung the pipe at him. Appellant was "just angry" at this point in time. On a scale of one to 10, appellant "was mad at them all the way up to a 10."

Appellant thought he did the right thing. When contacted by the police, however, he did not explain what had happened and say it was self-defense. Instead, he lied repeatedly to the officers and told Garza to lie for him as well. When appellant was arrested, he did not know what had happened to Chavez. He had no idea of Chavez's

12

condition when appellant left him on Pine Tree Lane. Appellant thought Chavez was hurt, though; appellant had hit him hard enough with the pipe that appellant knew Chavez was not going to get up and do the same to appellant. Appellant had no idea where he had hit Chavez; Chavez went down after hitting the window, appellant "hit him twice, ba-boom, and that was that." Appellant wished he would have let it all ride, but he did not feel safe doing that at the time. He chased Chavez and Rodriguez away from Donald Street because he was concerned they would come back with other people.

On January 9, 2006, William VanZant and Lisa Morris lived in an apartment in the same triplex as Chavez's mother. On that day, Morris let Chavez into their apartment. Chavez wanted money, but Morris told him she did not owe him any. [FN12] As he was walking out the door, Chavez said he would get his money one way or another by 5:00. Morris told him good luck and closed the door. Chavez said, "'F'ing bitch,'" and, once outside, kicked the screen door.

FN12. Chavez had provided Morris with what he said was methamphetamine, but she refused to pay for it because it was actually baking soda.

A couple of minutes later, Morris heard Chavez yelling. He was about halfway from his apartment to Morris's unit. Morris was going to go outside, but VanZant told her no and pushed her out of the way and went outside himself. Morris was right behind him. As VanZant walked outside, he saw Chavez coming toward him. Chavez raised his arms and said, "'What, white boy?'" VanZant either did not respond or said, "'You don't want to do that.'" Chavez came at VanZant, who walked toward him, grabbed him by the throat, and tried to push him backwards. VanZant got Chavez down against the railing of the window sill. Chavez's head hit the window and broke a pane of glass. Chavez then stabbed VanZant twice under the left arm.

(See Answer, Ex. 1.)

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Stanislaus County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

1    Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

2    1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

3    (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

4    petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

5    II.    Standard of Review

6          Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

7    barred unless a petitioner can show that the state court's adjudication of his claim:

8          (1) resulted in a decision that was contrary to, or involved an unreasonable
          application of, clearly established Federal law, as determined by the Supreme
9          Court of the United States; or

10         (2) resulted in a decision that was based on an unreasonable determination of the
          facts in light of the evidence presented in the State court proceeding.
11

12   28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

13   (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

14         As a threshold matter, this Court must "first decide what constitutes 'clearly established

15   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

16   *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

17   Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

18   of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

19   'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

20   set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

21   the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

22   principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

23   . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

24   review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van

25   Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

26   Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

27   end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

28   at 126; Moses, 555 F.3d at 760.

1    If the Court determines there is governing clearly established Federal law, the Court must

2    then consider whether the state court's decision was "contrary to, or involved an unreasonable

3    application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28

4    U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if

5    the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

6    question of law or if the state court decides a case differently than [the] Court has on a set of

7    materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

8    72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in

9    character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third

10   New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to

11   [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

12   governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

13   clearly established Supreme Court precedent, the state decision is reviewed under the pre-

14   AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

15   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

16   the state court identifies the correct governing legal principle from [the] Court's decisions but

17   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

18   "[A] federal court may not issue the writ simply because the court concludes in its independent

19   judgment that the relevant state court decision applied clearly established federal law erroneously

20   or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

21   538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

22   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

23   Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

24   correctness of the state courts decision, the decision cannot be considered unreasonable. Id. If

25   the Court determines that the state court decision is objectively unreasonable, and the error is not

26   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

27   effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

28   Petitioner has the burden of establishing that the decision of the state court is contrary to

15

1  or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

2  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

3  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

4  state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

5  Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

6       AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1)

7  is limited to the record that was before the state court that adjudicated the claim on the merits,"

8  and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

9  Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state

10  courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v.

11  Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court

12  factual finding is not entitled to deference if the relevant state court record is unavailable for the

13  federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

14  Tamayo-Reyes, 504 U.S. 1 (1992).

15  III.   Review of Claims

16       A.  Gang Evidence

17       In his first claim, Petitioner alleges the trial court erred by excluding evidence of

18  Chavez's and Rodriguez's gang membership.  He claims this exclusion violated his due process

19  right to present evidence of self defense and his right to a fair trial.  He contends the gang

20  membership evidence was relevant to prove the actuality, degree and reasonableness of his fears

21  about the imminence of the danger presented by Chavez and Rodriguez, his need to defend

22  against that danger, and the reasonableness of his fear and conduct.

23       This claim was presented on direct appeal to the Fifth DCA which denied the claim in a

24  reasoned decision. (See Answer, Ex. 1.)  Petitioner then raised the claim to the California

25  Supreme Court.  (See Answer, Ex. 3.) The California Supreme Court denied the claim without

26  comment.  (See Answer, Ex. 3.)  When the California Supreme Court's opinion is summary in

27  nature, the Court must "look through" that decision to a court below that has issued a reasoned

28  opinion. Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the appellate

court analyzed and rejected the claim as follows:

*A. Background*

Appellant moved, in limine, to present evidence of three prior violent acts by Chavez, the third of which was the VanZant incident. In addition, he represented that Sanchez, who was related to Chavez, knew of Chavez's violent and turbulent character and his propensity for violence. Appellant further alleged that Rodriguez had told police that he and Chavez both were members of the Nortenos, a criminal street gang; further, Chavez was wearing a red shirt at the time of the incident. Appellant asserted that the evidence was probative of Chavez's dangerous character, and that appellant and the women at the house were scared when Chavez threatened to get a gun and return with his uncle and the Mexican Mafia, because they could rely on him doing what he said. Appellant argued that, under the law of self-defense, he was entitled to pursue Chavez, the aggressor, until all danger had passed, and the danger had not passed as long as Chavez was able to carry out his threats. Appellant asserted that even though he did not know of Chavez's past violence, it was probative with respect to how the jury would evaluate whether appellant believed Chavez was going to go get his friends.

The prosecutor conceded that the VanZant incident was recent in time, and that Evidence Code [FN13] section 1103 permitted admission of prior instances of violence by a victim to show his propensity for violence when it was relevant. He argued, however, that section 1103 was intended to aid the jury in determining who the aggressor was at the time of a homicide. By his own admission, appellant saw Chavez go down after trying to go through a window, then went up to him and hit him with a pipe; hence, there was no immediate threat to appellant as required for self-defense. As a result, the prosecutor concluded, past violent acts served no purpose other than "to dirty up the victim," and should be excluded under section 352 as more prejudicial than probative. As for using the evidence to show Chavez had a violent character, the prosecutor argued, if appellant did not know about the incidents, then they were not relevant because they could not have affected his state of mind.

FN13. Further statutory references are to the Evidence Code unless otherwise stated.

The trial court concluded that there was enough evidence to make appellant's theory of self-defense potentially viable. It found the VanZant incident clearly relevant, and ruled that it would be admitted.

In his opening statement, defense counsel mentioned the VanZant incident. He subsequently told the jury that Rodriguez and Chavez were members of a criminal street gang, the Nortenos. The prosecutor's relevance objection was sustained. Outside the presence of the jury, defense counsel argued that gang membership was relevant because those at the residence saw Chavez and Rodriguez were dressed in red and knew they were Nortenos; thus, when the two said they were going to get the rest of "their guys," those at the house knew who they were going to get. Defense counsel argued that this went to the fear that caused appellant to act in self-defense.

The prosecutor countered that what was relevant for self-defense was appellant's state of mind; he could testify that he thought they were gang members and about his fear in that regard, but since the evidence would show that appellant did not know Chavez or Rodriguez, gang membership was irrelevant. The prosecutor argued that an expert witness would have to be called to establish Chavez and Rodriguez were members of a criminal street gang, and he clarified that he was objecting to gang evidence on grounds of relevance and section 352.

The court found that Chavez's alleged gang affiliation might have some relevance, given the statements made at the house. Accordingly, it allowed defense counsel to discuss it in his opening statement, but precluded counsel from showing a video of Rodriguez telling police that he was not a gang member but Chavez was.

The next morning, the prosecutor cited *People v. Tafoya* (2007) 42 Cal.4th 147 and *People v. Cash* (2002) 28 Cal.4th 703 for the proposition that acts by a victim are irrelevant to a self-defense claim unless the defendant is aware of them. The prosecutor conceded that if appellant was going to testify that he associated Chavez and Rodriguez with gangs based on their colors and their threats to get gang members and come back, it would be relevant, but it was not relevant simply to have someone testify that gangs are violent or the victim was a violent gang member. Defense counsel subsequently completed his opening statement, telling the jury in part that the evidence would show Chavez and Rodriguez were yelling threats about getting the Mexican Mafia and getting guns, and that the people at the house believed the threats and that the incident was not over.

Defense counsel brought up the issue again a couple of days into the presentation of evidence. He argued that Chavez and Rodriguez were recognized as wearing gang clothing and were making threats to go and get other gang members, and that this was probative of the fear that would be reflected in the testimony of those who lived at the Donald Street residence, including appellant. Defense counsel asserted that it was relevant to why appellant did what he did, and, as a matter of due process, he should be allowed to raise the issue and, if necessary, impeach Rodriguez with his statement to the police if he denied gang affiliation.

The prosecutor reiterated his position that, for self-defense, it was the defendant's state of mind-what he knew-that was important. Appellant had said he did not know Chavez and Rodriguez; hence, their gang affiliation was not relevant. The prosecutor agreed, however, that if appellant wanted to testify that he was scared because he thought they were gang members, that would be proper. Whether Rodriguez thought Chavez was a gang member, as Rodriguez told police, was irrelevant to what appellant thought. The prosecutor also pointed out that if the defense brought in a witness to give an expert opinion with regard to gang affiliation in this case, it would give the prosecution the opportunity to bring in other gang experts, and would end up taking a lot of time to litigate something that was not relevant to this trial. Accordingly, the evidence should be excluded under section 352.

The trial court, finding the evidence presented by Rodriguez's statement to police "fairly weak" as to Rodriguez's supposed gang status, concluded it was bound by the cases cited by the prosecutor. It stated: "I think without the defendant's knowing these two individuals and knowing their gang status, it would be improper for me to allow this evidence. And I do think that a 352 analysis is required in this situation. And I think the probative value of such evidence is really relatively slight, and the danger of prejudicial effect is great. [¶] And on that basis, I'm going to exclude this proffered evidence and any attempt to go into it. [¶] Now, you are certainly entitled to ask your own client what he felt. And, you know, he can express his fears, but that's what it is, his fears. And so I am going to uphold my prior evidentiary ruling."

The testimony elicited at trial with respect to appellant's beliefs about Chavez and Rodriguez, the threats made by the two, and the VanZant incident, is set forth in the statement of facts, *ante.* The trial court sustained the prosecutor's relevance objections whenever defense counsel sought to ask someone other than appellant if he or she believed Chavez's and Rodriguez's threats. However, the defense was permitted to elicit from Antonia Ramirez that in response to those threats, she told Veronica to go inside

18

and get the children and put them in the back room. When appellant testified that during the confrontation at the house, he was concerned because one of his adversaries was wearing red, the trial court sustained the prosecutor's relevance objection when defense counsel asked appellant what that meant to him. During cross-examination, however, the prosecutor asked appellant about his being scared because he saw somebody wearing red. Appellant responded that he did not think he said he was scared, but instead said something about it being an indicator they might be gang related. When asked if he thought the shirt Chavez was wearing when he died was a gang-related shirt, appellant answered, "Well, on our side of town, anybody that wears a solid color red, they're just asking for trouble if they're not affiliated with a gang." Appellant further testified that, although he did not think the shirt was a gang-related shirt, he thought the person wearing it might have been gang related. When the prosecutor asked whether the shirt, in and of itself, made appellant scared of the victim, appellant responded that the color of it made him concerned. Asked again if the shirt made him scared of the victim, appellant responded, "It concerned me. To a point."

Appellant raised exclusion of the gang evidence as one of the grounds in his motion for a new trial. The trial court denied the motion, noting that it had made a finding appellant did not know of the gang affiliation at the time of the incident, so it was irrelevant, and that in excluding the evidence, the court had relied on its irrelevance as well as a section 352 analysis.

*B. Applicable Legal Principles*

"Self-defense is *perfect* or *imperfect.* For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury. [Citation.] A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide. [Citations.] [¶] One acting in imperfect self-defense also actually believes he must defend himself from imminent danger of death or great bodily injury; however, his belief is unreasonable. [Citations.] Imperfect self-defense mitigates, rather than justifies, homicide; it does so by negating the element of malice. [Citations.]" (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) California also recognizes the doctrines of perfect and imperfect defense of another. (Pen.Code, § 197; *People v. Randle, supra,* at pp. 996-997.)

In determining whether a defendant's belief in the need to defend was objectively reasonable, "a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation *and with similar knowledge* ....' [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant....' [Citation.] To do this, it must consider all the ""facts and circumstances ... in determining whether the defendant acted in a manner in which a reasonable man would act in protecting his own life or bodily safety .""" [Citation.] As [the California Supreme Court] stated long ago, '... a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind....' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083, original italics omitted, italics added.) Under the objective "reasonable person" test, "[t]he issue is not whether defendant, or a person like him, had reasonable grounds for believing he was in danger. The issue is whether a 'reasonable person' in defendant's situation, *seeing and knowing the same facts,* would be justified in believing he was in imminent danger of bodily harm." (*People v. Jefferson* (2004) 119 Cal.App.4th 508, 519, italics added.) Where the doctrine of defense of another is concerned, "reasonableness is tested from the point of view of the defendant, not the point of view of the person being defended. [Citation.]" (*People v. Genovese* (2008) 168 Cal.App.4th 817, 830.)

In the case of either perfect or imperfect defense of self or others, "'the fear must be of imminent harm. "Fear of future harm-no matter how great the fear and no matter how great the likelihood of the harm-will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury."' [Citations.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 551.) "'"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" ... [¶] This definition of imminence reflects the great value our society places on human life.' [Citation.] Put simply, the trier of fact must find an *actual* fear of an *imminent* harm. Without this finding, imperfect self-defense is no defense." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

In the present case, jurors were instructed on both perfect and imperfect self-defense and defense of others. It appears to us that, by returning a verdict of second degree murder, they necessarily found appellant did not genuinely believe in the need to defend against imminent peril.[FN14] Thus, there is no issue as to the reasonableness of any fear, rendering the purported errors arguably harmless. Nevertheless, we have examined appellant's contentions and find no error.

FN14. This is understandable, since appellant himself testified that when he swung the pipe and struck Chavez, he was "just angry," and Chavez was not moving.

*C. Analysis*

1. Gang Affiliation

"'The rules pertaining to the admissibility of ... evidence are well-settled. Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]' [Citation.]" (*People v. Heard* (2003) 31 Cal.4th 946, 972-973; see also §§ 350, 351.)

"Though Evidence Code section 1100 permits the introduction of character evidence except as otherwise provided by statute, a major exception is that such evidence is generally inadmissible to prove a person's conduct on a specific occasion. (Evid.Code, § 1101, subd. (a).)" (*People v. Roberts* (1992) 2 Cal.4th 271, 300.) However, subdivision (a) of section 1103 provides an exception to the exception: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character. [¶] (2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)."

"An accused claiming self-defense in a prosecution for homicide ... is entitled to prove the dangerous character of the victim. If this character was known to the defendant, the evidence tends to show the defendant's apprehension of danger; if it was not known, the evidence nevertheless tends to show that the victim was probably the aggressor. '[T]he law recognizes the well-established fact in human experience that the *known* reputation or character of an assailant as to violence and turbulence has a very material

20

bearing on the degree and nature of the apprehension of danger on the part of a person assaulted; also that one who is turbulent and violent may the more readily provoke or assume the aggressive in an encounter.' [Citations.]" (1 Witkin, Cal. Evidence (4th ed. 2000) Circumstantial Evidence, § 57, p. 389, italics added; see, e.g., *People v. Smith* (1967) 249 Cal.App.2d 395, 404; *People v.. Brophy* (1954) 122 Cal.App.2d 638, 647-648.)

We assume membership in a criminal street gang, if it be established, would tend to show a victim's dangerous character, even if the purpose of the evidence was not necessarily to prove conduct of the victim in conformity with that trait of character under section 1103, subdivision (a). (See *In re Wing Y.* (1977) 67 Cal .App.3d 69, 79 [membership in organization with criminal activities does not lead reasonably to inference as to conduct of member on given occasion].) Here, however, the evidence was undisputed that appellant did not know either Chavez or Rodriguez. As a result, evidence that either or both were actually gang members was irrelevant to appellant's state of mind. (See *People v. Tafoya, supra,* 42 Cal.4th at pp. 164-165; *People v. Cash, supra,* 28 Cal.4th at p. 726; *People v. Mathis* (1965) 63 Cal.2d 416, 430; *People v. Thomas* (1969) 269 Cal.App.2d 327, 329 [FN15].) Appellant was entitled to act on appearances, and to that end was permitted to testify regarding his concern that the two might be gang members. As what was relevant was appellant's knowledge and state of mind, the trial court did not err in excluding evidence of Chavez's and Rodriguez's actual gang membership, if any, as irrelevant.

FN15. In *People v. Thomas, supra,* 269 Cal.App.2d 327, the defendant fought with "Toughy," who died as a result. Upon his conviction for voluntary manslaughter, the defendant argued that pursuant to section 1103, the trial court erred in excluding the testimony of a defense witness that he had fought before with "Toughy." The appellate court rejected the claim, observing that trial occurred prior to the effective date of the Evidence Code, and that before section 1103 was enacted, evidence of specific acts of the victim was inadmissible to prove character as circumstantial evidence of conduct. (*People v. Thomas, supra,* at pp. 328-329.) Contrary to appellant's suggestion, the advent of the Evidence Code did not affect the validity of the opinion's discussion of the *relevance* of specific acts of the victim of which the defendant had no knowledge.

*People v. Minifie* (1996) 13 Cal.4th 1055 does not lead to a different conclusion. In that case, the California Supreme Court stated: "A defendant charged with assaultive crimes who claims self-defense may present evidence that the alleged victim had previously threatened him. Here, we decide the admissibility of threats against the defendant, not by the *victim,* but by *third parties.* We conclude that evidence of third party threats is admissible to support a claim of self-defense if there is also evidence from which the jury may find that the defendant reasonably associated the victim with those threats." (*Id.* at p. 1060.) The court noted that "the law recognizes the justification of self-defense ... because the defendant acted reasonably under the circumstances. Reasonableness is judged by how the situation *appeared* to the defendant...." (*Id.* at p. 1068, original italics omitted, italics added.)

In the present case, if the jury believed appellant, then it *appeared* he might be confronting gang members who were capable of carrying out the threats they were making, and jurors were required to assess the reasonableness of his response based on that appearance. As the California Supreme Court stated more than 100 years ago, "[W]henever a man exercises his right of self-defense, he must be understood to act on the facts as they appear to him. 'And if without fault or carelessness he is misled concerning them, and defends himself correctly, according to what he supposes the facts to be, he is justifiable; though they are in truth otherwise, and he really had no occasion

21

1    for the extreme measure.' [Citation.]" (*People v. Miles* (1880) 55 Cal. 207, 209-210.)

2        Appellant's reliance on *Commonwealth v. Stewart* (Pa.1975) 336 A.2d 282, is
     unavailing. In that case, the exclusion of evidence of gang activity in the defendant's
3    neighborhood, which was offered by the defense to corroborate his claim that he panicked
     and so did not possess the mental state necessary for first degree murder, was held to be
4    reversible error. (*Id.* at pp. 286-287.) The court stated: "In cases where a defendant
     attempts to justify a killing as done in self-defense, evidence of the deceased's violent
5    predilections is relevant in determining the defendant's mental state at the time of the
     killing. There is no reason why a defendant who is attempting to establish that as a result
6    of terror-stricken panic he did not possess the mental state necessary for murder in the
     first degree should not be permitted to introduce evidence of the deceased's violent
7    nature. In the context of gang violence, the violent nature not only of the deceased, but
     also of the gang of which he was a member may be relevant to the inquiry into the
8    defendant's state of mind, for his state of mind is related to the threat presented by group
     violence." (*Ibid.*, fns. omitted.) Appellant ignores the footnote in which the court makes
9    clear: "Of course, the relevancy of such evidence *depends upon whether the defendant
     knew of the incidents in question.*" (*Id.* at p. 286, fn. 6, italics added.)

10
     Here, while appellant may have had some knowledge of gangs, he had no
11   knowledge with respect to Chavez and Rodriguez.[FN16] "The court is not required to admit
     evidence that merely makes the victim of a crime look bad." (*People v. Kelly* (1992) 1
12   Cal.4th 495, 523.)

13       FN16. The prosecutor gave a good example in his opening summation, albeit with
         respect to the VanZant incident. He told the jury: "Let's say you're out driving
14       your car and you see somebody in the middle of the road and they're giving you
         mean looks and you run them down and kill them. And you find out afterwards he
15       was a mass murderer that killed hundreds of people. Well, you can't now just say,
         'Hey, look, I was acting in self-defense, 'cause look, he's a mass murderer.' It
16       doesn't work that way, because it had to be something that you knew about when
         you acted on it. And clearly in this case he did not know about it."

17
     Even assuming evidence of Chavez's and Rodriguez's purported gang membership
18   had some relevance, because, for instance, there was a question as to who was the initial
     aggressor, or because it may have impeached Rodriguez's credibility (see *People v.
19   Samaniego* (2009) 172 Cal.App.4th 1148, 1168), the trial court did not abuse its
     discretion in excluding the evidence under section 352 (see *People v. Minifie, supra,* 13
20   Cal.4th at p. 1070 [defendant's evidence of self-defense is subject to all normal
     evidentiary rules, including § 352]; *People v. Brown* (2003) 31 Cal.4th 518, 534 [trial
21   court has discretion to admit or exclude evidence offered for impeachment] ). Section 352
     provides: "The court in its discretion may exclude evidence if its probative value is
22   substantially outweighed by the probability that its admission will (a) necessitate undue
     consumption of time or (b) create substantial danger of undue prejudice, of confusing the
23   issues, or of misleading the jury." The trial court enjoys "broad discretion" in weighing
     evidence under the statute, and its exercise of that discretion "'must not be disturbed on
24   appeal *except* on a showing that the court exercised its discretion in an arbitrary,
     capricious or patently absurd manner that resulted in a manifest miscarriage of justice.
25   [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

26       Appellant focuses on whether gang membership evidence would have been
     unduly prejudicial. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1121 [for § 352
27   purposes, "'prejudicial' is not synonymous with 'damaging,' but refers instead to
     evidence that '"uniquely tends to evoke an emotional bias against defendant"' without
28   regard to its relevance on material issues"].) But, as the statute makes clear, undue

                                            22

consumption of time is a valid reason for exclusion, separate and apart from prejudice. In the present case, evidence concerning Chavez's and Rodriguez's actual gang membership, as opposed to appellant's belief in that regard, was of little or no probative value since appellant had no knowledge of it. Given this lack of probative value, impeachment of Rodriguez's denial to police of gang membership would have amounted to impeachment on a collateral matter. (See *People v. Ayala* (2000) 23 Cal.4th 225, 301.) Moreover, proving membership in a criminal street gang could very well have led to a trial within a trial on the issue, resulting in undue consumption of time.[FN17] The trial court's ruling under section 352 was not an abuse of discretion. (See *People v. Wright* (1985) 39 Cal.3d 576, 586-588; *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 448-450.)

> FN17. Although not discussed by the parties, we suspect the prosecutor would have wanted to call his own gang expert in response to appellant's expert, if only to explain the unlikelihood that Nortenos, who trace their origin to the Nuestra Familia, would threaten to return with members of the Mexican Mafia, the prison gang organization under which Sureno gangs operate, and the principal enemy of the Nuestra Familia and Nortenos. (See, e.g., *People v. Fuentes* (2009) 171 Cal.App.4th 1133, 1135; *People ex rel. Reisig v. Broderick Boys* (2007) 149 Cal.App.4th 1506, 1512; *People v. Valdez* (1997) 58 Cal.App.4th 494, 499, fn. 2, 502; Gang Watchers <http://www.gangwatchers.org/gang-names.html> [as of May 20, 2010].)

For the first time in his reply brief, appellant asserts that the exclusion of the gang membership evidence prejudiced his attempt to mitigate murder to voluntary manslaughter based on a sudden quarrel or heat of passion. He says Chavez's and Rodriguez's gang membership "powerfully supported whether appellant was provoked or reacted passionately under the obscuring influence of intense emotion or the provocation would have caused a person of average disposition to act rashly."

As a general proposition, points raised for the first time in a reply brief will not be considered unless good reason is shown for failure to present them earlier. (*People v. Adams* (1990) 216 Cal.App.3d 1431, 1441, fn. 2; *People v. Jackson* (1981) 121 Cal.App.3d 862, 873.) Although appellant mentioned provocation in his opening brief, he did so in one sentence, without discussion. Moreover, as appellant's own recitation of the pertinent facts shows, the gang membership evidence was addressed in the trial court only in terms of self-defense and defense of others.

In any event, "[t]o establish voluntary manslaughter under a heat of passion theory, both provocation and heat of passion must be found. [Citation.]" (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.) "The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) Subjectively, the defendant must actually kill under the heat of passion. (*Ibid.*) Objectively, "'[f]irst, the provocation which incites the killer to act in the heat of passion case must be caused by the victim or reasonably believed by the accused to have been engaged in by the decedent. [Citations.]'" (*People v. Gutierrez, supra,* at pp. 708-709.) Second, "'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*People v. Steele, supra,* at pp. 1252-1253.) In short, "defendant's subjective response is immaterial." (*People v. Rich* (1988) 45 Cal.3d 1036, 1112.)

We are not prepared to say that the fact of gang membership is sufficient to

arouse, in a reasonable person, such passion as reduces an unlawful killing from murder to manslaughter. Moreover, even assuming gang violence might, under some circumstances, raise an inference of fear and panic (see *Commonwealth v. Stewart, supra,* 336 A.2d at pp. 286-287), a reasonable person would not be provoked by a fact he or she did not know. Appellant did not know Chavez and Rodriguez were gang members, if in fact they were.

In light of the foregoing, the trial court did not abuse its discretion in excluding the gang membership evidence. Moreover, its ruling did not impinge upon appellant's federal constitutional rights. (See *United States v. Scheffer* (1998) 523 U.S. 303, 316; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103; *People v. Espinoza* (1992) 3 Cal.4th 806, 818.)

(See Answer, Ex. 1.)

"A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." U.S. v. Scheffer, 523 U.S. 303, 308 (1998); see Taylor v. Illinois, 484 U.S. 400, 410 (1988); Rock v. Arkansas, 483 U.S. 44, 55 (1987); Chambers v. Mississippi, 410 U.S. 284, 295 (1973). A defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 284. A defendant's interest in presenting evidence may thus "'bow to accommodate other legitimate interests in the criminal trial process.'" Rock, 483 U.S. at 55, *quoting* Chambers, 410 U.S. at 295; accord, Michigan v. Lucas, 500 U.S. 145, 149 (1991). "As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Scheffer, 523 U.S. at 308. "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Scheffer, 523 U.S. at 308, *quoting*, Rock, 483 U.S. at 56; accord, Lucas, 500 U.S. at 151. The Supreme Court has found "the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." Scheffer, 523 U.S. at 308, *quoting*, Rock, 483 U.S. at  58; Chambers, 410 U.S. at 302; Washington v. Texas, 388 U.S. 14, 22-23 (1967).

In this case, the trial court excluded certain gang evidence with respect to the victim and his companion. The court determined under Cal. Evid. Code § 352 that the gang evidence had little to no probative value, and admission of the evidence would have necessitated an undue consumption of time. This was so because Petitioner had no knowledge of the victim's or his

companion's gang affiliation, if any, at the time of the offense.  Thus, the evidence had no

relevance to Petitioner's state of mind with respect to self defense and could only serve to "dirty

up" the victim.

As noted by Respondent, the Supreme Court has not squarely addressed whether the trial

court's exercise of discretion to exclude gang membership evidence violates a defendant's right

to present evidence.  This is fatal to Petitioner's federal claim.  Since the issue has never been

addressed by the Supreme Court, there is no clearly established Federal law for purposes of

review under AEDPA.  Thus, the inquiry is at an end and the Court must defer to the state court's

decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.  See Brown v.

Horell, 644 F.3d 969, 983 (9th Cir.2011) ("Between the issuance of Moses and the present, the

Supreme Court has not decided any case either 'squarely address[ing]' the discretionary

exclusion of evidence and the right to present a complete defense or 'establish[ing] a controlling

legal standard' for evaluating such exclusions. Brown, therefore, cannot- as the petitioner in

Moses could not - show that the state appellate court's ruling was contrary to or an unreasonable

application of clearly established Supreme Court precedent").

Even so, the exclusion did not "significantly undermine[] fundamental elements of

[Petitioner's] defense." Scheffer, 523 U.S. at 315.  As noted above and by the appellate court, the

gang evidence had no relevance to Petitioner's state of mind since Petitioner was not aware at the

time of the offense whether the victim and his companion were gang affiliated.

Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

The claim should be denied.

B.  Denial of Motion for New Trial

Petitioner next alleges he was denied effective, conflict-free assistance of counsel when

the trial court denied trial counsel's motion for new trial.  The motion for new trial was based on

witness Sanchez's failure to complete his testimony.

This claim was also raised on appeal to the Fifth DCA where it was rejected in a reasoned

decision.  Petitioner then raised the claim to the California Supreme Court, and it was denied without comment.  Therefore, this Court must "look through" to the appellate decision below. Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth DCA denied the claim as follows:

*A. Background*

The prosecutor originally subpoenaed Robert Sanchez as a witness. A problem arose, however, when Sanchez, who was represented by counsel, decided he wanted transactional immunity before he testified. The prosecutor was not prepared to make that arrangement, so decided not to use Sanchez. Defense counsel then announced that he wanted to call Sanchez as a witness, and that Sanchez was willing to testify with use immunity. Defense counsel filed a motion requesting that the court grant such immunity.

During discussion of the matter the next morning, defense counsel related that Sanchez had a misdemeanor case pending in another court and was remanded that morning, but counsel went over to the other court and obtained permission for Sanchez to be released and to surrender at 7:00 that evening. Thus, if Sanchez was going to testify, defense counsel needed him to do so that afternoon.

That afternoon, the court denied the immunity request. After consultation with his attorney, Sanchez decided to testify anyway. As a result, he was called as a defense witness. Defense counsel completed his direct examination, and the prosecutor began his cross-examination. In the course of that cross-examination, the prosecutor elicited that Sanchez had been taken into custody that morning, and that defense counsel had "pull[ed] some strings" to secure his release. The prosecutor further elicited that Sanchez had been in custody a week or two earlier, that he had contacted defense counsel's office, and that he had been released on his own recognizance.

Just before the evening recess, the prosecutor represented that he had about 20 minutes of questioning remaining. Outside the jury's presence, defense counsel reminded the court that Sanchez was to surrender at 7:00 that evening. The trial court ordered Sanchez to return in the morning, and directed that a minute order be issued to that effect so the jail would have notice. The court made clear to Sanchez that it was not altering the other court's surrender order, and Sanchez stated that he understood.

The next morning, the court announced it had been advised that Sanchez had not returned, despite being ordered to do so, and that there was no record he had surrendered himself at the jail. After issuing a bench warrant for Sanchez, the court informed the jury that Sanchez's cross-examination was going to be interrupted and would be completed later, and had the defense proceed with its next witness.

That afternoon, defense counsel noted that Sanchez still had not appeared. When he suggested the jury might be sent home until Sanchez was found, the court refused. The prosecutor stated that the People would be willing to waive any irregularity and continue on with the case, but defense counsel was unwilling to enter into any waivers, because he wanted to conduct redirect examination based on some of the allegations that were purportedly made against him.

The next morning (Thursday), defense counsel related that he had received a communication to the effect that Sanchez would appear the following Monday at 10:00 a.m. to testify, and would go into custody when he was done. Counsel stated that he wanted to proceed with the presentation of evidence in the meantime, but that he was doing so with the explicit understanding that he was not waiving any issues regarding a

mistrial if Sanchez did not appear. That was acceptable to the court, and so the defense proceeded to present appellant's testimony.

The following Monday, the court announced that Sanchez had not yet appeared. Defense counsel stated he would be willing to play the video recordings of Sanchez's statements to police in lieu of raising a mistrial issue, and to waive any other Sixth Amendment issues. When the court asked whether defense counsel was saying he was moving for a mistrial if he was not able to show the videos, counsel responded that if the People were not agreeable to showing Sanchez's statements, then he wanted time to discuss it with Mr. Perry, his employer. Counsel noted that he did not want to do the trial over again, and observed that he had gotten everybody there and the evidence in, and that the only loose end was Sanchez, "[n]ot that he says all that much." The prosecutor clarified that, because Sanchez's recorded statement contained a great deal of hearsay and covered several objectionable areas, the People opposed playing it in its entirety. The prosecutor suggested that, if the defense wanted to go into certain areas on redirect, perhaps the video could be spliced together to cover those area. With respect to a mistrial, the prosecutor argued the defense would not be entitled to one because Sanchez was remanded into custody by another department, and it was defense counsel who went in and got him released, thereby giving Sanchez the opportunity to fail to appear.

During a break, defense counsel conferred with Mr. Perry. Counsel subsequently moved that, in lieu of a mistrial, Sanchez's statement be played. The prosecutor asked for time to determine what should be redacted from the transcript. The court observed that the only area of Sanchez's testimony that might be considered prejudicial was the inference raised by the prosecutor that somehow defense counsel pulled strings to obtain preferential treatment for Sanchez, and it suggested that could be cured by admonition to the jury. Defense counsel agreed that if such an admonition could be fashioned, it would be sufficient. The court and counsel then spent some time in chambers, after which the jury was admonished: "Robert Sanchez, a witness in this case, did not reappear to complete his testimony. In the course of his testimony the issue of his release from custody was raised. Mr. Sanchez's release from custody was decided by another judge in another court, with both a representative of the district attorney's office and Mr. Sanchez's attorney present. His failure to appear is not due to any actions taken by either side in this case, and you are not to draw any conclusions from his failure to appear."

Following his conviction, appellant, who was still represented by Mr. Wildman, moved for a new trial on the ground, inter alia, that he was denied his Sixth and Fourteenth Amendment rights to compulsory process and, as a result, was denied a fair trial. Appellant asserted that Sanchez's voluntarily absenting himself from trial, after partially testifying, denied appellant the opportunity to obtain Sanchez's full and complete testimony and to respond to the issues raised by, and tenor of, the prosecutor's partial cross-examination. Appellant related that defense counsel acceded to simply admonishing the jury in order to avoid a mistrial and the necessity of retrying the case, but that appellant was "unwavering in his desire that the case be mistried," and was not asked to waive his constitutional right to compulsory process.

Appellant subsequently wrote a letter to the court that resulted in a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. Although not making a finding that there was ineffective assistance of counsel, the court appointed new counsel for appellant. Mr. Wentz, appellant's new attorney, filed an addendum to the motion for new trial in which he incorporated appellant's original motion, and further claimed appellant was denied the right to counsel at a critical juncture in the trial proceedings. Boiled down to its basics, Wentz's assertion was that, in deciding not to move for a mistrial when Sanchez failed to reappear to complete his testimony, Wildman acted on his own behalf, and not on behalf of appellant.

In support, Wentz submitted a declaration by Wildman, in which Wildman related that his firm was appointed to represent appellant on or about August 1, 2006. Prior to October 27 of that year, Wildman went on medical leave, undergoing heart valve replacement surgery on November 13. At the time he went on leave, he had, among other cases, four pending homicide cases, including that of appellant. Upon his return to work on January 16, 2007, he commenced scheduling those cases, two of which were pending trial. On January 17, he appeared for trial setting and set appellant's case for jury trial on July 23, 2007. On July 11, trial was reset for March 17, 2008, due to significant problems in locating witnesses that were necessary for appellant's defense. At the time appellant's trial was reset, Wildman was already scheduled for a special circumstances trial on November 13, 2007. That case ultimately concluded on December 18, 2007, leaving Wildman three months to recover from that trial and to prepare for appellant's trial.

During his preparation of appellant's trial, Wildman encountered significant problems in locating witnesses, both locally and in Texas. According to his recollection of events, "There were numerous problems and frustrations in locating witnesses, and once located, obtaining cooperation." Although Wildman was having medical issues, particularly with his medications, he was not aware of the cause at the time. He was reluctant to continue the case, as he was concerned he would not be able to relocate even those witnesses who had been found and subpoenaed. Wildman was also reluctant to seek a continuance because of his backlog of cases assigned before his medical leave and additional cases assigned after his return.

Wildman related the events surrounding Sanchez's failure to appear to complete his testimony. In pertinent part, he related that, when Sanchez did not appear as promised and could not be contacted through friends or family, Wildman did not want a mistrial and sought alternatives. He requested that Mr. Perry come to court to discuss the situation with him, because Wildman was concerned that he was not being objective about the issue and options to avoid a mistrial, and whether he was violating appellant's rights in not requesting a mistrial because of his own personal desire not to have to retry the case. Wildman related that appellant was adamant that he wanted a mistrial. Appellant did not want this jury to continue hearing the case, because Sanchez was the only witness who saw what happened and was willing to testify, and he was not there to conclude his testimony and respond to the allegations made by the prosecutor during cross-examination. In addition, there were several other items to be covered on redirect, including Sanchez's knowledge of the victim's propensity for violence. Appellant was not happy with the admonition resolution that was agreed upon to avoid the mistrial issue.

The People opposed the new trial motion. In pertinent part, they argued that appellant was not denied the right to compulsory process for obtaining witnesses in his favor because he received the remedy requested, namely, the admonition. The People further argued appellant could establish neither deficient performance by counsel nor prejudice. Emerson filed a supporting declaration, stating that at no time during the approximately four-week-long trial did Wildman appear weak or confused or to be having any ill health effects, and that during trial, Wildman told Emerson that he felt better than he had in years.

Appellant submitted a supplemental declaration by Wildman. In it, Wildman related that six weeks before appellant's trial commenced, he was informed that it had been discovered, following a procedure in late 2007, that he had a gastrointestinal tumor. Although it was believed that the tumor had been removed, he was scheduled for a repeat procedure in October 2009. If there was a recurrence of the tumor, he would then have to undergo surgery, radiation therapy, or chemotherapy, and there was a likelihood any such treatment would result in his being unable to continue practicing law. Thus, Wildman was facing the possibility of having 19 months to complete his pending cases, and he was

28

trying to avoid requesting a mistrial and then sandwiching a retrial of appellant's case into the time period that was already scheduled for other pending homicide trials. In retrospect, Wildman concluded that he should not have proceeded with appellant's trial in March 2008, as he had not come to terms with this latest medical issue. Wildman could only speculate as to the effect of his medication issues on his thought processes; all of his medications were changed in February, and he discontinued one of the original medications after appellant's trial, as he was concerned with detoxification and discontinuance issues. At the hearing on the new trial motion, Wentz argued that, by Wildman's own admission, Wildman was incompetent during trial, and could not make the critical decision about a mistrial due to his medications and other issues. As a result, appellant was entitled to a new trial because he did not receive a fair trial.

The court noted that it had observed both attorneys very closely during the entire trial, which lasted almost a month. It felt Wildman was in full possession of all of his faculties and intelligence, and that he did as good a job as any defense attorney could have done with this case. The court found that Wildman did not, as alleged, make a pro forma appearance; to the contrary, he was very effective in his entire presentation. With respect to Sanchez's failure to appear, the court recalled that several alternatives were discussed, and that both attorneys had had a full opportunity to examine the witness, at least initially. The court gave the jury admonition over the prosecutor's objection that the wording favored the defense, and it believed appellant's rights were protected. The court stated that it had considered whether it would be appropriate to grant a mistrial, asked for or not, and concluded it would not be justified in this situation. After addressing the other grounds upon which the new trial motion was based, the court denied the motion.

*B. Analysis*

"A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. '"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."' [Citation.]" (*People v.. Davis* (1995) 10 Cal.4th 463, 524.) Applying that standard, we conclude the trial court did not err. As its ruling was reasonable, we will not disturb it on appeal. (See *People v. Clair, supra,* 2 Cal.4th at p. 667.)

First, appellant failed to establish a violation of his right to compulsory process, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and article I, section 15 of the California Constitution. (See *Washington v. Texas* (1967) 388 U.S. 14, 19; *In re Martin* (1987) 44 Cal.3d 1, 30; see also Pen.Code, § 686.) The mere failure to appear of a defense witness simply does not, without more, establish a violation of an accused's right to present witnesses in his or her own defense. (See, e.g., *Washington v. Texas, supra,* 388 U.S. at pp. 22-23 [right to compulsory process denied where state evidentiary rule, disqualifying alleged accomplice from testifying on behalf of defendant, arbitrarily denied defendant the right to put on stand a witness physically and mentally capable of testifying to events witness personally observed, and whose testimony would have been relevant and material to defense]; *In re Martin, supra,* 44 Cal.3d at pp. 30-32 [ compulsory process right violated when government interferes with exercise of defendant's right to present witnesses on own behalf; defendant must demonstrate misconduct, interference, and materiality in order to establish violation].) Moreover, it has been held that there is no constitutional error when the defense has received the only remedy requested at trial, such as an admonition to the jury. (See *United States v. Desena* (2d Cir.2002) 287 F.3d 170, 176.)

Second, appellant has failed to establish that Wildman rendered ineffective assistance by failing to move for a mistrial when Sanchez did not reappear to complete

his testimony. As previously stated, "[t]o secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Cunningham, supra,* 25 Cal.4th at p. 1003; see generally *Strickland, supra,* 466 U.S. at pp. 687-694.) "[I]n assessing a Sixth Amendment attack on trial counsel's adequacy mounted on direct appeal, competency is presumed unless the record affirmatively excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, italics omitted.)

Here, the rational basis for defense counsel's failure to request a mistrial is readily apparent: He was concerned about again locating and obtaining cooperation from defense witnesses, and he was also concerned about "sandwiching" a retrial amid his other pending cases. We see nothing wrong with counsel being concerned about his ability to adequately prepare for, and defend appellant in, a retrial that might be facing serious and significant time constraints. Moreover, even assuming witness testimony from this trial would be admissible in a subsequent trial in the event of witness unavailability, counsel reasonably could have concluded that live testimony would be more advantageous to appellant than a cold transcript. "[T]he ... risks and disadvantages of defense counsel's strategy do not establish that counsel was incompetent for adopting it. Rather, the risks and disadvantages must be considered in light of the available alternatives." (*People v. Hayes* (1990) 52 Cal.3d 577, 624.) We cannot say counsel's performance fell below the standard to be expected of a reasonably competent attorney, even though appellant may have been adamantly opposed to counsel's failure to move for a mistrial. (See *People v. Freeman* (1994) 8 Cal.4th 450, 485 [by choosing professional representation, accused surrenders all but handful of fundamental personal rights to counsel's complete control of defense strategies and tactics].)

Appellant says that, even assuming there was no ignorance or misapplication of law, Wildman's failure to move for a mistrial was improperly based, at least in part, on a conflict of interest-his personal desire not to retry the case in light of the ongoing and future medical concerns he was facing.

"Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." (*Strickland, supra,* 466 U.S. at p. 668.) The 8constitutional guaranty of the assistance of counsel entitles the defendant to *effective* assistance. (*People v. Bonin* (1989) 47 Cal.3d 808, 833-834.) Included in the right to effective assistance is "the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. [Citations.] 'It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant.' [Citation.] 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests. [Citation.]"' [Citations.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 417; accord, *People v.. Bonin, supra,* 47 Cal.3d at p. 835.)

In *People v. Doolin, supra,* 45 Cal.4th at page 421, the California Supreme Court recently concluded that attorney conflict claims under the state Constitution are no longer

1   to be analyzed under a standard different than that articulated by the United States
2   Supreme Court with respect to such claims under the federal Constitution. The court
    noted that "post- *Strickland,* the high court's analysis of Sixth Amendment conflict of
3   interest claims has evolved into one of ineffective assistance of counsel, which requires a
    defendant to show counsel's deficient performance and a reasonable probability that but
    for counsel's deficiencies, the result of the proceeding would have been different.
4   [Citations.]" (*People v. Doolin, supra,* at p. 421.)

5          In *Strickland,* the United States Supreme Court held that prejudice is presumed
    "when counsel is burdened by an actual conflict of interest." (*Strickland, supra,* 466 U.S.
6   at p. 692.) Even so, the rule is not a per se rule of prejudice. Instead, "[p]rejudice is
    presumed only if the defendant demonstrates that counsel 'actively represented
7   conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's
    performance.' [Citation.]" (*Ibid.*) As the California Supreme Court has explained: "In the
8   context of a conflict of interest claim, deficient performance is demonstrated by a
    showing that defense counsel labored under an actual conflict of interest *'that affected*
9   *counsel's performance*-as opposed to a mere theoretical division of loyalties.' [Citations.]
    '[I]nquiry into actual conflict [does not require] something separate and apart from
10  adverse effect.' [Citation.] 'An "actual conflict," for Sixth Amendment purposes, is a
    conflict of interest that adversely affects counsel's performance.' [Citation.]" (*People v.*
11  *Doolin, supra,* 45 Cal.4th at pp. 417-418.)

12         "A claim of ineffective assistance of counsel based on a trial attorney's failure to
    make a motion or objection must demonstrate not only the absence of a tactical reason for
13  the omission [citation], but also that the motion or objection would have been
    meritorious, if the defendant is to bear his burden of demonstrating that it is reasonably
14  probable that absent the omission a determination more favorable to defendant would
    have resulted. [Citations.]" (*People v. Mattson* (1990) 50 Cal.3d 826, 876.) In the present
15  case, not only did defense counsel have a reasonable tactical purpose for not moving for a
    mistrial, but the trial court considered granting a mistrial whether asked for or not, and
16  concluded such an action would not be justified because appellant's rights were
    adequately protected by the admonition it gave the jury. "A motion for mistrial is directed
17  to the sound discretion of the trial court. [The California Supreme Court has] explained
    that '[a] mistrial should be granted if the court is apprised of prejudice that it judges
18  incurable by admonition or instruction. [Citation.] Whether a particular incident is
    incurably prejudicial is by its nature a speculative matter, and the trial court is vested with
19  considerable discretion in ruling on mistrial motions.' [Citation.]" (*People v. Jenkins*
    (2000) 22 Cal.4th 900, 985-986, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854.)
20  The trial court manifestly did not abuse its discretion here. Appellant has failed to
    establish cause for reversal.
21
    (See Answer, Ex. 1.)
22
23         The law governing ineffective assistance of counsel claims is clearly established. <u>Canales</u>

24  <u>v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging

25  ineffective assistance of counsel, the court must consider two factors. <u>Harrington v. Richter</u>,

26  *supra*, 131 S.Ct. at 787; <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Lowry v. Lewis</u>, 21

27  F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was

28  deficient, requiring a showing that counsel made errors so serious that he or she was not

functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687. The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. <u>Harrington</u>, 131 S.Ct. at 787, *citing*, <u>Strickland</u>, 466 U.S. at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir. 1995). Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. <u>Strickland</u>, 466 U.S. at 688. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." <u>Harrington</u>, 131 S.Ct. at 787, *quoting*, <u>Strickland</u>, 466 U.S. at 687; <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," <u>Strickland</u>, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" <u>Harrington</u>, 131 S.Ct. at 787, *quoting*, <u>Strickland</u>, 466 U.S. at 693. "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" <u>Harrington</u>, 131 S.Ct. at 787-788, *quoting*, <u>Strickland</u>, 466 U.S. at 687. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. <u>Strickland</u>, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under 28 U.S.C. § 2254(d) is very difficult. <u>Harrington</u>, 131 S.Ct. at 788. Since the standards created by <u>Strickland</u> and § 2254(d) are both 'highly deferential,' when the two are applied in tandem, review is 'doubly' so. <u>Harrington</u>, 131 S.Ct. at 788, *quoting*, <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009).

As discussed by the appellate court, Petitioner complains that defense counsel failed to move for a mistrial when witness Sanchez was no longer available to testify. In applying

1    <u>Strickland</u>, the appellate court reasonably determined that counsel's decision not to request a

2    mistrial was not so egregious as to deprive Petitioner of a fair trial.  As explained by the appellate

3    court:

4                Here, the rational basis for defense counsel's failure to request a mistrial is readily
             apparent: He was concerned about again locating and obtaining cooperation from defense
5            witnesses, and he was also concerned about "sandwiching" a retrial amid his other
             pending cases. We see nothing wrong with counsel being concerned about his ability to
6            adequately prepare for, and defend appellant in, a retrial that might be facing serious and
             significant time constraints. Moreover, even assuming witness testimony from this trial
7            would be admissible in a subsequent trial in the event of witness unavailability, counsel
             reasonably could have concluded that live testimony would be more advantageous to
8            appellant than a cold transcript.

9    (<u>See</u> Answer, Ex. 1.)

10          Likewise, the appellate court rejection of Petitioner's claim that defense counsel was

11   burdened by a conflict of interest was not unreasonable.  The Supreme Court has held that the

12   Sixth Amendment right to effective assistance of counsel includes the right to counsel free from

13   conflicts of interest.  <u>Mickens v. Taylor</u>, 535 U.S. 162, 166 (2002); <u>Wood v. Georgia</u>, 450 U.S.

14   261, 271 (1981); <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 349-50 (1980).  In order to demonstrate a

15   conflict of interest, a petitioner must show that his counsel operated under an "actual conflict,"

16   which, "for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's

17   performance." <u>Mickens</u>, 535 U.S. at 172.  Nevertheless, and fatal to Petitioner's claim here, the

18   Supreme Court has not extended Sixth Amendment conflict of interest jurisprudence beyond

19   conflicts involving multiple concurrent representation.  <u>Mickens</u>, 535 U.S. at 162, 174-76.  Since

20   the issue remains an open question, <u>see</u> <u>Alberni v. McDaniel</u>, 458 F.3d 860, 873-74 (9th

21   Cir.2006), Petitioner cannot obtain relief since there is an absence of "clearly established"

22   Supreme Court law.  The claim must therefore be rejected.

23          Nevertheless, even if the Court were to consider defense counsel's alleged conflict of

24   interest, the claim fails. As stated by the appellate court, defense counsel had a reasonable tactical

25   purpose for not moving for a mistrial, and in any case, the trial court stated it would not have

26   granted a mistrial whether asked for or not since Petitioner's rights were adequately protected by

27   its admonition to the jury. (<u>See</u> Answer, Ex. 1.)  The state court rejection of this claim was not

28   contrary to, or an unreasonable application of, clearly established Supreme Court precedent as set

forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>See</u> 28 U.S.C. § 2254(d)(1). The petition must be denied.

### C.   Ineffective Assistance of Counsel - Failure to Object

Petitioner also claims he was denied the effective assistance of counsel when defense counsel failed to object to prosecutorial misconduct during summation.

Like the previous claims, this claim was presented on appeal to the Fifth DCA and denied in a reasoned decision.  It was then raised to the California Supreme Court and denied without comment.  Therefore, this Court must "look through" to the appellate decision below.  <u>Ylst</u>, 501 U.S. at 804-05 & n. 3.  In rejecting the claim, the Fifth DCA stated:

> During his opening summation to the jury, the prosecutor discussed manslaughter based on heat of passion. In part, he stated:

> "The defendant was provoked. Yes, he was provoked in this case. *That's not enough.* As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his judgment. And finally, the provocation would have caused an ordinary person of average disposition to act rashly, or in the same way that the defendant did. Again, that's pretty important there. *Ordinary person of average disposition. Would they have done the same thing. Would an ordinary person of average disposition [have] gone out there and killed Richard [Chavez] under the same circumstances. Would he have tracked him down with the pipe and killed him* when he lie-laid helpless there. In front of the window.

> "It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct.

> "What does that mean? When he says he got hit with a crossbow, he can't just say, Well, that pissed me off and I was acting under the heat of passion at that point, 'cause he hit me with a crossbow. 'Cause he's the one, he's the one that tracks Richard down at that point and rushes him on the porch. That's his own conduct at that point. He can't set up his own standard of conduct and then say hey, I'm acting out of, out of the heat of passion because of sufficient provocation in this case. So just keep that in mind when you go over the facts of this case. *Then again, consider whether an ordinary person of average disposition would have acted in the same way.*" (Italics added.)

> Appellant says the italicized portions of the argument misstated the law. Although counsel have broad discretion to discuss the legal and factual merits of a case, it is improper to misstate the law (*People v. Bell* (1989) 49 Cal.3d 502, 538), and a prosecutor who does so commits misconduct (*People v. Boyette* (2002) 29 Cal.4th 381, 435).

> "[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation.... The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition *to act rashly or without due deliberation and reflection.* [Citations.] 'Heat of passion arises when "at the time of the killing, the reason

of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition *to act rashly and without deliberation and reflection, and from such passion rather than judgment.*"' [Citation.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59, italics added.)

In *People v. Mendoza* (2007) 42 Cal.4th 686, 702-703, the California Supreme Court held that the prosecutor misstated the law when he implied that jurors could substitute their own subjective standard of behavior for that of the objective, reasonable person, by making statements such as, "'Would any of you do what he did here and say that's reasonable? Would any of you do that? No. Would any of you put a gun to people's heads? Would any of you do what he did here? Is that reasonable?'" In *People v. Najera* (2006) 138 Cal.App.4th 212, 223-224, the Court of Appeal found the prosecutor misstated the law by asking jurors whether a reasonable person would do what the defendant did, and telling them that the reasonable person standard is based on conduct, i.e., what a reasonable person would do in a similar circumstance. The prosecutor interspersed correct statements of the law with the incorrect ones, however, by stating, for example, that the standard was whether a reasonable person would be so aroused as to kill someone.

We need not determine whether the prosecutor misstated the law in the present case. Defense counsel failed to object, thereby forfeiting the issue for appeal. (*People v. Martinez* (2010) 47 Cal.4th 911, 955-956; accord, e.g., *People v. Friend* (2009) 47 Cal.4th 1, 29.) As a result, reversal of appellant's conviction is warranted only if defense counsel's failure to object violated appellant's constitutional right to the effective assistance of counsel. (*People v. Lopez* (2008) 42 Cal.4th 960, 972.)

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694 (*Strickland*).)

A defendant who claims ineffective assistance of counsel on appeal "must establish deficient performance based upon the four corners of the record." (*People v. Cunningham, supra,* 25 Cal.4th at p. 1003.) The appellate record rarely shows that a failure to object to argument was the result of counsel's incompetence; hence, such claims generally are more appropriately litigated by means of a petition for writ of habeas corpus. (*People v. Lopez, supra,* 42 Cal.4th at p. 966; see *People v. Cooper* (1991) 53 Cal.3d 771, 824.) Assuming deficient performance here, in any event, appellant has failed to establish prejudice. Defense counsel addressed the subject in his own argument. (See *People v. Cash, supra,* 28 Cal.4th at p. 735.) More importantly, the trial court instructed the jury on the correct standard. [FN23] It also told jurors that the attorneys' statements were not evidence, and that, if the attorneys' comments on the law conflicted with the court's instructions, jurors were required to follow the instructions. Absent any contrary indication, "[w]e assume the jury abided by the court's admonitions and instructions, and thereby avoided any prejudice. [Citation.]" (*People v. Stitely, supra,* 35 Cal.4th at p. 559; accord, *People v. Mendoza, supra,* 42 Cal.4th at p. 703; *People v. Gray* (2005) 37 Cal.4th 168, 217.)

35

FN23. Pursuant to CALCRIM No. 570, jurors were told, in pertinent part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] Number one, the defendant was provoked; [¶] Two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] And number three, the provocation would have caused the ordinary person of average disposition to act rashly and without due deliberation; that is, from passion rather than from judgment. [¶] ... [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. [¶] In deciding whether the provocation was sufficient, consider whether an ordinary person of average disposition would have been provoked, and how such a person would act in the same situation, knowing the same facts. [¶] If enough time passed between the provocation and the killing for an ordinary person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis."

(See Answer, Ex. 1.)

As previously noted, a claim for ineffective assistance of counsel must meet the two-part test advanced in Strickland. 466 U.S. 668.  First, Petitioner must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, [Petitioner] must show that the deficient performance prejudiced the defense.  Id. at 687.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.  Id. at 697.

In this case, the appellate court determined that Petitioner did not suffer any prejudice from the prosecutor's alleged misstatements during opening remarks.  The appellate court noted that defense counsel addressed the issue in his own argument.  Moreover, the trial court fully instructed the jury on the correct standard.  In addition, the court instructed the jury that counsel's statements were not evidence, and any comments made by counsel that conflicted with the court's instructions were to be disregarded in favor of the instructions.  As Respondent notes, the Supreme Court has stated:

[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.  Arguments of counsel which misstate the law are subject to objection and to correction by the court.  This is not to say that prosecutorial misrepresentation may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court.

1  Boyde v. California, 494 U.S. 370, 384-85 (1990).

2       In light of the trial court's instructions and defense counsel's arguments, there is no

3  reasonable probability that the prosecutor's remarks had any influence on the outcome.

4  Certainly, Petitioner has not demonstrated that the appellate court's rejection of the ineffective

5  assistance of counsel claim was contrary to, or an unreasonable application of, the Strickland

6  standard.  The claim must be denied.

7       D.   Appellate Court Misstatement of Facts

8       In his final claim for relief, Petitioner alleges the appellate court misstated material facts

9  and legal issues.  As noted by Respondent, this claim is not cognizable on federal habeas review.

10 In Franzen v. Brinkman, 877 F.2d 26, 26 (9th Cir.1989) (per curiam), *cert. denied*, 493 U.S. 1012

11 (1989), the Ninth Circuit held that "a petition alleging errors in the state post-conviction review

12 process is not addressable through habeas corpus proceedings." See also Montgomery v. Meloy,

13 90 F.3d 1200, 1206 (7th Cir.1996); McCowin v. Scott, 67 F.3d 100, 102 (5th Cir.1995); Jolly v.

14 Gammon, 28 F.3d 51, 54 (8th Cir.1994), *cert. denied,* 513 U.S. 983, 115 S.Ct. 462, 130 L.Ed.2d

15 370 (1994); Steele v. Young, 11 F.3d 1518, 1524 (10th Cir.1993); Bryant v. Maryland, 848 F.2d

16 492, 493 (4th Cir.1988); Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir.1987); Kirby v.

17 Dutton, 794 F.2d 245, 247-48 (6th Cir.1986).

18 IV.   Certificate of Appealability

19      A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

20 district court's denial of his petition, and an appeal is only allowed in certain circumstances.

21 Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

22 whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

23        (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
          district judge, the final order shall be subject to review, on appeal, by the court
24        of appeals for the circuit in which the proceeding is held.

25        (b) There shall be no right of appeal from a final order in a proceeding to test the
          validity of a warrant to remove to another district or place for commitment or trial
26        a person charged with a criminal offense against the United States, or to test the
          validity of such person's detention pending removal proceedings.

27
          (a)      (1) Unless a circuit justice or judge issues a certificate of appealability, an
28                 appeal may not be taken to the court of appeals from–

37

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## ORDER

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment and terminate the case; and

3) The Court DECLINES to issue a certificate of appealability.


IT IS SO ORDERED.

Dated:    May 21, 2012            /s/ Gary S. Austin
                            UNITED STATES MAGISTRATE JUDGE